(89 App. Div. 627.)

## WORTHINGTON et al. v. HERRMANN.

(Supreme Court, Appellate Division, Second Department. December, 1903.)

1. SALES—FRAUD—OFFICERS OF CORPORATION—SALE OF STOCK—REPRESENTA-
TIONS.
    Where the executive officers of a corporation gave an option to purchase
    their stock, covenanting to permit the purchaser a full examination of the
    company's affairs, and their statement as to the company's affairs, which
    was made a part of the option, though erroneous, was secured from the
    company's bookkeeper and an expert accountant, they were not chargeable
    with deceit, in the absence of any evidence of actual fraudulent intent.

2. SALES—OPTION—OFFER—EFFECT.
    An instrument executed by the owners of corporate stock, whereby they
    agree to sell to another person within a specified time for a specified price,
    is not an agreement between such parties, but a mere offer, revocable by
    the owners at any time before acceptance.

3. SAME—OPTION—REPRESENTATION.
    Where an option for the purchase of corporate stock, which was a mere
    offer and executed only by the owners of the stock, recited that the cor-
    poration was the owner of the assets and indebted to the amount shown
    in an annexed schedule, the recital and schedule amounted to a represen-
    tation, and could not be regarded as merely descriptive, as showing the
    understanding that led up to the agreement.

4. SALES—OPTION—CONSTRUCTION—WARRANTY.
    The owners of stock in a very large and growing corporation gave an
    option for the purchase of the stock. The option was given on February
    24, 1899, and was dated February 1, 1899, and recited that the corporation
    was the owner of the assets and indebted to the amount shown in an an-
    nexed schedule; but appended to the schedule was a paper entitled "Explan-
    atory Notes," which stated that the schedule was prepared from the balance
    sheet of April, 1898, and corresponded therewith, except that the bills
    payable had been increased and might thereafter be increased according
    to the requirements of the business, and except as to the statement of the
    values of certain stocks and good will, and as to the value of certain
    patents belonging to the company. There was evidence that the sellers
    had stated, before the option was accepted, that they could not and did not
    intend any warranty of the floating indebtedness. Held, that the recital,
    schedule, and the explanatory notes did not amount to a warranty.

5. SAME—CONSTRUCTION OF WARRANTY.
    If there was a warranty, it did not apply to the indebtedness of the cor-
    poration on February 1, 1899.

    Hooker, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by Charles C. Worthington and others against Theodore L.
Herrmann, impleaded with the Colonial Trust Company and William L.
Bull. From a judgment in favor of plaintiffs, defendant Herrmann ap-
peals. Affirmed.

The following is the opinion of Referee Odell:

All of the allegations of fact contained in the amended complaint, except
the allegations of performance by the plaintiffs, and that $70,000 of the pur-
chase price of the stock in question have not been paid by the defendant, are
admitted by the amended answer. So far as material at present, they may
be summarized as follows: Henry R. Worthington, was a corporation with
a share capital of $7,500,000, of which $5,500,000 consisted of common stock
of the par value of $100 per share. The plaintiffs owned or controlled 50,-
098 shares of this common stock. On February 24, 1899, they, without any
consideration, delivered to the defendant Bull a writing, signed only by them
and dated February 1, 1899, which purported to be an agreement between

them and Bull, by which they jointly and severally granted unto Bull, his "nominees or assigns," an option for 60 days from the date last mentioned for the purchase of the common stock owned by them, respectively, at $55 per share, and which provided that in case the said Bull, his "nominees or assigns," should accept said option, they (the plaintiffs) would deposit the stock with the said Bull as trustee, "to be held and dealt with pending the acceptance of the option and the completion of said purchase as may be arranged between the party of the second part [Bull] and his nominees or assigns." It was further provided that, at the request of Bull, "his nominees or assigns," the plaintiffs would procure the right to an examination by the purchaser of all property and assets of the corporation, and "submit to expert accountants all books of account, vouchers, bills receivable, and papers pertaining to the business heretofore conducted by the said company, and will afford such expert accountants every facility for acquiring information as to the character of the business of and the property of the company." In one of the recitals of said paper or agreement it was stated that "Henry R. Worthington is the owner of the assets and is indebted in the amount shown in the statement annexed hereto, marked 'Exhibit A,' which is embodied in this agreement as a part thereof." Exhibit A showed various assets, amounting to $7,648,355.64, and various liabilities, including the preferred stock, amounting to $2,401,342.85. Appended to this statement of assets and liabilities, and forming part of the exhibit, was a paper with the heading "Explanatory Notes." In this it was stated, among other things, that the "foregoing statement" was prepared from the balance sheet of April 1, 1898, and corresponded therewith, except in the statement of the values of certain stocks and the good will, patents, and patterns belonging to the company; that the bills payable had been increased by about $130,000 since the date of said balance sheet, and "may hereafter be increased or decreased according to the requirements of the business, but, if increased, the new balance sheet will show a corresponding increase in assets"; and that in the balance sheet of 1899 the outstandings and inventories and value of the tools would be corrected. On February 28, 1899, Bull delivered to Samuel Untermyer a paper signed by him and by Untermyer also, in which he was designated as vendor and Untermyer as purchaser, and in which it was recited that he was the holder and owner of the above-mentioned option, in connection with which he held 50,098 shares of the common stock of the Henry R. Worthington corporation, indorsed in blank, and by which he assigned and set over unto Untermyer, "his nominees and assigns, and to any corporation that may be organized to acquire the shares of stock referred to in said option or the property of the company, all the rights of the vendor under the accompanying agreement"—being the option agreement received by Bull from the plaintiffs. It was stipulated that the said stock should be deposited with the defendant the Colonial Trust Company, to be delivered to the purchaser or his nominee on the full payment of $55 per share to the plaintiffs and $1 per share to Bull within 30 days after acceptance of the option, and, in case the purchaser or his nominee should fail to make and complete such payment, the stock should be forthwith returned to Bull. Thereupon the plaintiffs deposited with said trust company the said 50,098 shares of common stock. Prior to March 10, 1899, Untermyer assigned and set over to the defendant Herrmann all his rights and interests under the said two writings of February 1st and February 28th, and thereafter, and prior to the 10th day of April, the defendant accepted the said option, and notified the plaintiffs and the defendant Bull of his acceptance thereof, and that he would pay the purchase price of the said 50,098 shares of the stock into the trust company, and upon such payment would demand delivery to him of the said shares. On April 10, 1899, which was the last of the 30 days mentioned in the said paper writing of February 28th, the defendant requested of the plaintiffs an extension of time for the payment of said stock. Thereupon an agreement was made, to which the plaintiffs and the defendants Herrmann and Bull were parties, by which it was agreed that the defendant should at once pay the plaintiffs, on account of the purchase money, the sum of $500,000; that the balance should be paid on or about the 15th of April, provided that from such balance should be deducted and deposited with the Colonial Trust Company the sum

of $70,000, to be disposed of as provided in said agreement; that "no other objection or question upon the closing of the transaction shall be raised by Mr. Herrmann, except as to his right to the said $70,000 or some part thereof;" and that, as follows: "If, by reason of the debts of Henry R. Worthington existing on first February, 1899, Mr. Herrmann has, under the agreement of first February, 1899, the legal right to insist upon a reduction (not exceeding Seventy thousand dollars) of the purchase price to be paid to Messrs. Worthington and Miller, or the legal right to recover from said Worthington and Miller any part of said Seventy thousand dollars, then and in any such case there shall be paid from said Seventy thousand dollars to Mr. Herrmann the amount of such reduction or such amount as Mr. Herrmann is so entitled to recover. The entire $70,000 less the amount, if any, of such reduction and recoverable amount, shall be paid to Messrs. Worthington and Miller. * * * The question of the right to such reduction or payment shall be determined by suit at law or in equity, unless the parties shall otherwise agree." Thereafter, and on the 15th of April, upon the payment by Herrmann of the balance of the purchase money, the said sum of $70,000 was deposited with the defendant the Colonial Trust Company, as provided by said agreement of April 10th, and this action was brought to determine the conflicting claims of the plaintiffs and the defendant Herrmann thereto.

Briefly stated, the contention of Herrmann is that the third recital of the paper of February 1st was a warranty by the plaintiffs that on that date the indebtedness of the Henry R. Worthington corporation and its book accounts and bills receivable were as set forth in Exhibit A in the said recital referred to; that the defendant accepted the said option in reliance upon such warranty; that such warranty was false, in that on February 1st the indebtedness of the corporation was much larger, and the book accounts and bills receivable were much less, than as so represented; that the said representations as to assets and liabilities were made by the plaintiffs with the intent to deceive the defendant; that he was deceived thereby, and damaged in the sum of $244,230.17, and therefore, because of both such breach of warranty and such fraud and deceit, the defendant is entitled to have paid to him the said deposit of $70,000, and also to have his action against the plaintiffs to recover the residue of the damages sustained by him. There are other facts of more or less importance which are either not disputed or clearly proved, to which reference may be made hereafter. In so far as the defendant's claim rests upon the charge of fraud and deceit, it is not supported by the proofs. The plaintiffs, when they issued the option, were the executive officers of the Worthington corporation, but it is not to be presumed from that fact that they had accurate knowledge of its financial condition or of the numerous details of its vast business. They can be charged with only a general knowledge of matters not entering into and forming part of their own personal duties in the administration of its affairs. When, in their negotiations with Mr. Untermyer, they undertook to ascertain the value of the stock which they were offering for sale, they applied for information as to assets and liabilities to the bookkeeper in the employ of the corporation, and accepted as correct the statement furnished by him and an expert accountant, and this they embodied in the option, qualifying it by the explanatory notes. It may have been erroneous, and the use of it by them may have produced damage to the purchaser for which they are liable, but direct proof of an intent by the plaintiffs to deceive, or proof of facts from which such intent may reasonably be inferred, is wholly wanting. The covenant in the option by which the plaintiffs obligated themselves to secure to the purchaser the fullest examination of the company's affairs seems to me to go far towards disproving any such intention. Upon the testimony I am unable to find as a fact that the plaintiffs were guilty of deceit or bad faith in any part of the transaction out of which this litigation has arisen. "The gravamen of the action [for deceit] is actual fraud, and nothing less will sustain it." Kountze v. Kennedy, 147 N. Y. 129, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651; Schwenck v. Naylor, 102 N. Y. 686, 7 N. E. 788. If the defendant has any cause of action, it is for a breach of the alleged warranty said to be found in the third recital of the option paper.

It is earnestly argued in behalf of the plaintiffs that the only function of such a recital as the one in question is to show the prior understanding of the parties, or, in the language of one of the learned counsel, "to state the facts the understanding of which has led up to or induced the agreement"; that it is not strictly a part of the agreement; and that while it may be resorted to when the operative part of the agreement is ambiguous, for the purpose of construing the instrument and determining the intent of the parties, the law never gives to it the force or character of a covenant. It is, however, admitted that a recital may be so framed as to operate as an estoppel, and so, in effect, create a warranty, or so as to operate as a representation; but it is claimed that in the latter case it must be regarded as "descriptive" only, made jointly by all the parties, and imposing no liability upon either party in favor of any other. These propositions are enforced by examples or illustrations which are convincing so far as they go, but not applicable to the peculiar circumstances of this case. Nor, in my judgment, is the question determined by any of the authorities cited in the briefs of plaintiffs' counsel. In Marryat v. Marryat, 28 Beav. 224, the attempt was to convert a simple contract debt into a specialty, and so avoid the statute of limitations applicable to the former. By a written instrument under seal the debtor declared, in a recital, the amount of his indebtedness, and then devoted certain property to the payment of it. The property was insufficient to pay the indebtedness, and the creditor sought to recover the residue, insisting that the recital was a covenant. This contention was overruled, the master of the rolls saying that the only object of the recital was to "ascertain, free from any dispute, the amount" which was to be secured, and that the deed was executed, "not for the purpose of creating any covenant from Marryat, but for the purpose of giving a security for the simple contract debt which he admits to be due." There was no controversy as to the amount of the debt; the recital of the amount was wholly unnecessary; it did not, and was not intended to, influence the creditor; it was not made as an inducement to the creditor to accept the security; it did not in any way enter into the transaction between the parties, except as defining the interest of the creditor in the property conveyed to him. The other English cases cited are of similar character. In Holmes v. Hubbard, 60 N. Y. 183, the facts were that upon the dissolution of a partnership the interest of one partner (D.) was purchased by the other (H.), and a bond was given by H., with a surety, conditioned that he would indemnify D. and save him harmless "from all and singular the debts and liabilities that may be existing against said copartnership." The words "Liabilities as per schedule of indebtedness hereto attached" were inserted at the end of the formal part of the bond. It was held that these words limited the broader language of the condition, just as it is claimed in the present case that the explanatory notes limit and qualify the language of the recital in dispute, and that the obligors were not liable for a copartnership debt not mentioned in the schedule. In Burr v. American Spiral Spring Butt Co., 81 N. Y. 178, it was recited that the plaintiffs were about to publish a book which would be sold by subscription in every state of the Union and in Canada. It was not a statement of an existing fact, but an expression of a present intention to do something in the future, and the court's conclusion was, upon the testimony, that it "must be regarded in the nature of a proposition as to the mode of doing the business" which was the subject of the agreement between the parties. In Williams v. Barkley, 165 N. Y. 48, 58 N. E. 765, the point decided is well stated in the headnote as follows: "Where the recital in an agreement is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if unambiguous, must prevail, because it is the most important." Neither of the cases referred to presented facts at all resembling those of the case at bar; but they clearly establish that there is no fixed and inflexible rule applicable to all recitals in all sorts of instruments, and by which they must be judged, and that it is only when they are ambiguous or at variance with the operative part of an agreement, which is itself free from ambiguity, that they may be disregarded.

Speaking generally, it may be safely assumed that every recital in an agreement is put there for a purpose, and that the matters recited are regarded as of some substance and importance by the contracting parties. The purpose

for which a recital is inserted, and the scope and force and meaning to be given to it, are to be determined, not only by a reference to the instrument containing it, but also by a reference to the circumstances which attended or led to the making of it. "In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed. Indeed, the great object and practically the only foundation of rules for the construction of contracts is to arrive at the intention of the parties." Gillet v. Bank of America, 160 N. Y. 555, 55 N. E. 292.

Now, under what circumstances was the recital in question made? The plaintiffs were the owners of more than nine-tenths of the common stock of the Henry R. Worthington corporation. They offered it for sale at 55 per cent. of its par value. Negotiations were had with Mr. Untermyer, who proposed to purchase. It was natural, as was said in Titus v. Poole, 145 N. Y. 414, 427, 40 N. E. 228, that he should require information as to the value of the stock. The corporation was heavily capitalized, and was carrying on an extensive manufacturing business, with branches or agencies in different states. The value of its stock depended upon its visible and tangible assets, its liabilities, the extent and results of its business, its facilities for doing business, and that indeterminate thing called "good will." The proposed transaction was a large one, calling for the investment by the purchaser of a vast amount of money. Whether to buy or not to buy was a question which required time and deliberation to answer. So Mr. Untermyer wisely secured from the plaintiffs an option on the stock for 60 days from the 1st day of February, 1899. The terms of the option were stated in a written paper prepared in the first instance by Mr. Untermyer, and amended by Mr. Miller, and finally settled to the satisfaction of both parties about February 24th. The second party to this paper, which is called the "Option Agreement," was the defendant Bull, who is described by Mr. Miller as an "intermediary," and who, in whatever he did in the transaction, must be regarded as the representative of the plaintiffs. The fact is not directly proved, I think, but it is a most natural and reasonable, if not a necessary, inference from the circumstances disclosed by the testimony, that the recital relating to the assets and liabilities of the corporation was inserted in the option by Mr. Untermyer. It called for information which the plaintiffs were to supply. It must have been understood by all parties that the conclusion of Untermyer and his associates to buy or not to buy would be largely influenced by the report which the plaintiffs might make as to the financial condition of the corporation, or, in other words, the statement they might furnish of the corporate assets and liabilities. Upon its face the option agreement was incomplete without such statement, which, when prepared, was to be annexed to the option, and, when annexed, was not to become or be regarded as merely a part of the recital, but was to be "embodied in this agreement as a part thereof." If there be a general rule, as was claimed upon the argument, and as plaintiffs' counsel insist in their briefs, that a recital is a representation of all the parties to an agreement, because it expresses a common understanding which has led up to the covenants and upon which the covenants are based, it certainly has no application to a case like the present. The option paper was not an agreement. It was an offer—nothing more—made without consideration, and revocable at the pleasure of the plaintiffs at any time before acceptance. It was executed by the plaintiffs only, and not by the nominal party of the second part. The statement of assets and liabilities was furnished by the plaintiffs at the request of the proposed purchaser, and for the precise purpose of informing him and assisting him to decide whether he would purchase the stock which the plaintiffs desired to sell; and, as already remarked, the statement, by the terms of the recital, entered into and became a part of the offer or option agreement, having the same effect, as I understand the case, as if it had been formally incorporated in the "operative part" of the instrument. If the statement had not been accompanied by the explanatory notes, I should not hesitate to hold that, read in connection with the recital, it was such a representation as the courts declare to be a warranty (Hawkins v. Pemberton, 51 N. Y. 198, 10 Am. Rep. 595; Fairbank Canning Co. v. Metz-

ger, 118 N. Y. 260, 23 N. E. 372, 16 Am. St. Rep. 753), which became operative as such upon the acceptance of the option by the purchaser, unless his right to insist upon it as a warranty had been lost by reason of events occurring or facts brought to his knowledge in the interim. The option paper is dated February 1, 1899. It was not delivered to Bull, nor were its terms definitely settled until February 24th. It was not transferred by Bull to Untermyer until February 28th. The language of the recital is that "Henry R. Worthington is the owner of the assets and is indebted in the amount." The defendant contends that this was a declaration of the condition of the corporation on the day of the date of the instrument—that is, February 1st. The plaintiffs insist that whatever representation was made was made when the instrument took effect by delivery—that is, on February 24th.

It is not necessary at present to decide between these two contentions. The important inquiry is: What was the representation that was made? It is found in Schedule A, annexed to the option, and that schedule consists of two parts: First, the statement of assets and liabilities; and, second, the explanatory notes. Included in the list of assets are items of land and buildings and patterns and drawings and tools and fixtures and good will and patents, which are entered at values which amount in the aggregate to the sum of $4,103,625.34. It is conceded that these valuations are estimated, not actual, and that, being mere expressions of opinion, they are not covered by the alleged warranty. Other assets items are: Accounts receivable, $1,031,204.38; cash, $98,292.29. Included in the list of liabilities are the following: Notes payable, $275,000; accounts payable, $34,822.15; mortgage on real estate, $42,500. A reference to the explanatory notes plainly shows, I think, that these various items of assets and liabilities were not intended by the plaintiffs, and could not have been understood by the defendant, as a representation or exhibit of the condition of the corporation on the 1st of February, 1899, for it was distinctly stated in the notes as follows: "The foregoing statement was prepared from the last balance sheet of the company of April 1, 1898, and corresponds therewith, except in the statement of the values of the stocks of the Worthington Pumping Engine Company, the United States Manufacturing Company, and the good will, patents, and patterns belonging to the company. Bills payable have been increased by about $130,000 since the date of said balance sheet." Now, conceding the defendant's construction of the third recital of the option paper, the situation was that the proposed purchaser stipulated for, and the plaintiffs undertook to furnish, a statement of the assets and indebtedness of the Worthington corporation as they were on February 1, 1899. The plaintiffs did not perform in this particular. They furnished a very different statement, advising the purchaser that the figures, with a few exceptions, were taken from the balance sheet of the preceding year and corresponded therewith. They further advised him that in the balance sheet of 1899 the value of the tools would be corrected by adding the cost of new tools bought during the year, and that the "outstandings and inventories will also be corrected to correspond with the books." Only as to one item did they assume to state the change that had occurred since February 28, 1898, the date to which the April balance sheet brought the affairs of the corporation. "Bills payable," they said, "have been increased by about $130,000." This informed the purchaser that the amount of bills payable outstanding on February 1, 1899, was $405,000. The testimony of Mr. Anyon is—and it is not disputed—that the bills payable on that date amounted to only $375,000. Surely there was no breach of warranty as to that item of indebtedness. Mr. Untermyer testifies that when the option was arranged and settled between himself and Miller it contained the statement of assets and liabilities, but not the explanatory notes. It had not then been signed by Worthington and Miller. When signed by them and delivered to Bull, and, of course, when transferred to the defendant, the notes were attached, forming a part of the instrument, and explaining and qualifying the figures in the statement. With such explanation the statement was not, and did not purport to be, a statement of the assets and indebtedness of the company on February 1st. It was not such a statement as the recital called for, and as the purchaser was entitled to, but it was accepted by him without other objection or complaint than that the indebtedness shown by it, amounting to over $450,000, was a

88 N.Y.S.—6

"great disappointment," and larger than had been previously represented. This sum of $450,000 included the $130,000 increase of bills payable mentioned in the explanatory notes, and in the letter to Miller, written on March 1st, before the option was accepted in which the objection or complaint referred to was made, Mr. Untermyer asked for "the amount of your cash, bills receivable and open accounts on February 1st"; showing, as the learned counsel very reasonably contend, that, with the explanatory notes which had caused his surprise and disappointment before him, he did not understand that the figures in the statement represented, or were intended to represent, the assets and liabilities of the corporation on that date. The testimony does not show that the plaintiffs made any representation concerning the statement contained in Schedule A, except that it had been prepared from and corresponded with the balance sheet of April 1, 1898, and that its figures would be corrected in the balance sheet of 1899. I must, therefore, find against the defendant on the question of a warranty.

Other facts and circumstances help me to this conclusion. Henry R. Worthington was a great corporation, a "going concern," doing a large business, in the course of which, by purchases and sales and collections and payments, the amount of its cash in hand, its bills and accounts payable, and its bills and accounts receivable necessarily changed from week to week, if not from day to day. When Mr. Untermyer was informed that on February 28, 1898, or on April 1, 1898, the accounts receivable of the corporation amounted to $1,031,204.38, and the cash in hand amounted to $98,292.29, and the notes payable amounted to $275,000, and the accounts payable amounted to $34,822.15, he was not at liberty to understand, and to act upon such understanding, that the same condition of credits and debits existed on February 1, 1899. It was impossible that it should be so. He was informed by the notes that the bills payable had been increased by $130,000. He was informed by Miller's letter of March 2d, in answer to his inquiry of the preceding day, that the amount of cash on hand on February 1st was "over $85,000," or, say, $13,000 less than the amount shown in the statement. He testified: "I always understood [it] was a going concern, or I would not have entertained the purchase of it." He knew, therefore, that its floating open indebtedness was changing from day to day, and that on February 1st it was perhaps more, perhaps less, than on April 1, 1898. He made no inquiry except as noted above. In this action the dispute is limited to the $70,000 on deposit with the trust company, and by the agreement of April 10th the defendant is entitled to no portion of that deposit, unless, "by reason of the debts of Henry R. Worthington existing on first February, 1899, Mr. Herrmann has, under the agreement of first February, 1899, the legal right to insist upon a reduction (not exceeding Seventy thousand dollars) of the purchase price to be paid to Messrs. Worthington and Miller, or the legal right to recover from said Worthington and Miller any part of said Seventy thousand dollars." There can be no right to either a reduction or a recovery except upon the ground of deceit or for a breach of warranty. I find that there was no deceit. I am also of the opinion that there was no warranty, but, if there was a warranty, it did not extend to or cover the indebtedness of the corporation on February 1st. That consisted of bills payable and accounts payable. According to Adams, the defendant's expert witness, accounts payable are not included in bills payable, which are "the promissory notes outstanding of the company." As mentioned above, the bills payable on February 1st were less than as represented by the plaintiffs. As to accounts payable, they made no representations except that by the balance sheet of April 1, 1898, they were shown to then amount to $34,822.15. There is other testimony which is not favorable to the defendant's claim. On the 1st of March, before the acceptance of the option, and while it was subject to recall by the plaintiffs, Mr. Untermyer wrote to Mr. Miller that the indebtedness of the company as shown by "your statement" (referring to the explanatory notes) was a "great disappointment." This letter was answered in part by Mr. Bull, who was the "intermediary," the party of the second part to the option paper, by whom the negotiations for the sale of the stock to Mr. Untermyer had been in large part carried on, and from whom Mr. Untermyer received a transfer of the option. Mr. Bull wrote on March 4th: "In our conversation on the subject

of floating indebtedness I have stated again and again that we could not be bound for any special amount, as, with the demands of an increasing business. or with the resources of a less active one, the floating indebtedness must inevitably fluctuate. We can only say that for any increase in floating indebtedness we shall show at least a corresponding growth in quick assets, and if, as you say, this is not satisfactory, a new issue is being raised which we cannot undertake to meet." Mr. Bull testifies that he had made that statement as to floating indebtedness to Mr. Untermyer more than once prior to the 2d of March, and Mr. Miller testifies that prior to the acceptance of the option, and prior to February 24th, he had told Mr. Untermyer that under no circumstances would he state to him the indebtedness of a running business. This testimony Mr. Untermyer does not deny. He does deny that any such statements were made by Mr. Bull at the meeting on the 10th of April. Referring to this testimony, the plaintiffs argue, and very sensibly it seems to me, that the rule that a warranty of quality or condition does not cover visible defects is applicable here, as, before the defendant accepted the option, he had fair and abundant notice by the explanatory notes and the statements of Bull and Miller that no warranty as to the floating indebtedness of the corporation was intended or would be given.

It is not necessary to discuss other points which are presented in the elaborate briefs of counsel. My judgment is that the defendant has failed to sustain the allegations of warranty and deceit set forth in his amended answer. and that the plaintiffs are entitled to judgment as demanded in their complaint.

Argued before BARTLETT, WOODWARD, JENKS, HIRSCHBERG, and HOOKER, JJ.

Edward M. Shepard, for appellants.
Guggenheimer, Untermyer & Marshall, for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion of Hamilton Odell, Esq., referee; HOOKER, J., dissenting. Order granting extra allowance affirmed, without costs.

---

(94 App. Div. 331.)

MEUER v. PHŒNIX NAT. BANK.

(Supreme Court, Appellate Division, First Department. May 13, 1904.)

1. CHECKS—TRANSFER WITHOUT INDORSEMENT.
      Title to a check payable to a specified person passes by delivery without indorsement.

2. SAME—TITLE CONVEYED—EQUITIES.
      The transfer of a check by the payee by delivery without indorsement destroys its negotiability, and the transferee takes merely his transferror's title, subject to any equities between him and the drawer.

3. BANKS—CERTIFICATION OF CHECK—LIABILITY TO HOLDER.
      Negotiable Instrument Law, Jan., 1897, p. 756, c. 612, § 323, as amended by Laws 1898, p. 977, c. 336, § 29, provides that, where a check is certified by the bank on which it is drawn, the certification is equivalent to an acceptance. Section 324 (page 756) provides that, where the holder of a check procures it to be accepted or certified, the drawer and all indorsers are discharged from liability thereon. Section 325 (page 756) provides that a check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless it accepts or certifies the check. Section 79 (page 731) provides that, where the holder of an instrument payable to his order transfers it for value without indorsing it, the transfer vests in